## In re ARANOFF & SON et al.
### No. 4065.

District Court, N. D. Georgia, Rome Division.

Nov. 28, 1931.

Maddox, Matthews & Owens, of Rome, Ga., for creditors filing objections to homestead exemptions.

Lamar Camp, of Rome, Ga., for bankrupts.

UNDERWOOD, District Judge.

In this case the two individual bankrupts, E. Aranoff and Jack Aranoff, claimed the statutory homestead exemption to the extent of $1,600 each. The trustee in bankruptcy sold all of the assets of the bankrupts and set aside $1,600 in cash for each of them. Exceptions to the allowance of these homesteads were filed by five creditors, George De Witt Shoe Company, Commander Shirt Company, American Raincoat Company, Red Wing Shoe Company, and Endicott Johnson Corporation. Upon the hearing on these exceptions, the referee overruled same, and approved the trustee's action in setting aside the homestead exemptions. The objecting creditors filed their petition for review of the referee's order allowing the homesteads.

The grounds of objections on review may be briefly summarized as follows:

(1) That a large and unexplained shrinkage of the net assets of the business and an excessive increase in its liabilities during the period from January 8, 1930, to November 15, 1930, constitute such willful fraud as to make the allowance of homesteads improper.

(2) That the bankrupts willfully and fraudently concealed and withheld large sums of money, and failed to record same on their books.

With respect to the charge of unexplained shrinkage in assets and increase in liabilities, the evidence shows that, at the beginning of the period in question, there were no liabilities and a stock inventory amounting to $4,551.19. In addition to the stock inventory, there was an item of cash on hand and in bank of $825, and personal property of $600. Further consideration of these items will be passed, however, for the time being, and consideration be here given

only to the matter of shrinkage in stock inventory.

During the above-mentioned period bankrupts bought and paid for goods amounting to $5,220.41, and bought on credit and did not pay for goods amounting to $9,040, making a total of assets to be accounted for during this period of $18,811.60, computed at cost price. There was a bank transaction of a loan of $1,000 during this time, but this was paid and need not be further considered.

The inventory taken by the receiver of the goods on hand at the time of the filing of the petition in bankruptcy amounted to about $8,295.41. This represents the cost prices of some of the goods, but with respect to others "the cost price was reduced quite a good deal, because he did not think they were worth that much. He was trying to get at the real value." It seems from the evidence that an addition of $600 to the receiver's inventory prices would be a reasonable allowance to make such prices comparable with cost price. Adding, then, this $600 to the receiver's inventory of $8,295.41, we have a total of $8,895.41, representing the cost price of the goods in possession of the bankrupts at the time of the filing of the petition in bankruptcy. In addition to this, however, there should be further added $600 to cover the invoice price of shoes which were not included in the receiver's inventory because claimed by a shoe company. This last item would bring the cost price of goods on hand at the time of the filing of the petition to a total of $9,515.41. Subtracting this from the total amount of assets, at cost prices, of $18,811.60, would leave to be accounted for goods amounting, at cost prices, to $9,296.19.

Corresponding figures in the briefs of objecting creditors are erroneous, in that they do not reduce the values and prices of the stock of goods to a common denominator. They compare things that are not comparable. For example, they compare with the actual cost prices the value placed upon the stock of goods in the bankruptcy petition, estimated at $6,000, while the appraisal value of these same goods by the receiver amounted to $8,295.41, which, if adjusted to cost prices, would represent goods at actual cost of $9,515.41 instead of the estimate of $6,-000 used by the objecting creditors. In other words, an error of $3,515.41, or nearly the amount of the shrinkage claimed in their briefs.

The books of the bankrupts show cash sales during this period of $9,595.46, and credit sales, accounts unpaid, of $220, making a total of sales of $9,815.46, so that, if the books are correct, and there is no evidence to the contrary, it will appear that goods amounting, at cost prices, to $9,296.19, were sold for $9,815.46.

The evidence further shows that during the period in question there was a great business depression, that many stores were selling at a loss, and every one struggling to keep his business afloat. There was also evidence that the bankrupts sold considerable goods at cost and below cost. It would appear, therefore, from this evidence that the shrinkage in assets is explained, if the bankrupts' statements are true. No evidence was adduced to contradict the statements of the bankrupts on which the foregoing conclusions are based.

The above, however, has reference only to the question of book accounting for the physical assets, and does not account for the increase in liabilities. As above stated, there were no liabilities at the beginning of the period in question. At the end of this period there were, in addition to an amount due for wages of $125 and a secured claim of $150 on an automobile, the personal property of Jack Aranoff, claims arising out of the business amounting to $9,079.47, which practically balance the amount of goods bought on credit, amounting to $9,040.

There still remains to be explained what went with the cash received for the sale of goods, inasmuch as those bought on credit, amounting to $9,040, were not paid for. The total amount of cash coming into the business during the period in question arising from sales amounted to $9,595.46. Now $5,-220.41 of goods were bought and paid for during this period, which leaves an unexplained difference of $4,375.05. As against this item, and in explanation thereof, the expenses shown by the evidence, for conducting the business, were as follows: Drawings, in the nature of salaries, by Jack Aranoff, $1,677.48, and by E. Aranoff $1,123.15; rent, $750; gas, etc., $150; expenses on business trip to New York, $150—making a total of $3,850.63. Taking these expense items from the balance received from sale of goods, amounting to $4,375.05, we have unaccounted for the sum of $524.42. The testimony further shows that the two individual bankrupts drew from the business, in addition to the amounts actually charged to their accounts on the books of the partnership, certain petty cash items which they estimated to amount, during the period, to

about $300 each. If these last-mentioned items amounted to as much as $524.42, the cash received from sales would be fully accounted for.

The fixtures and personal property remained practically the same, except that $300 were spent for improvements in the store, and any difference in the inventory values of fixtures and personal property was due principally, if not altogether, to depreciation.

At the beginning of the period, bankrupts inventoried goods $825. The schedules in bankruptcy show $281 cash in hand and expenditure of $229 for attorneys' fees in the bankruptcy proceeding. These two items make a total of $510, and leave the difference in the cash account at the beginning and the end of the period about $315. This difference it probably accounted for by the expenditures for improvements, interest charges, and miscellaneous amounts not referred to in the evidence.

The other grounds of objecting creditors to the granting of the homesteads are that the personal unrecorded drawings of the two individual bankrupts, above referred to, would constitute such willful fraud as would prevent their being entitled to the homesteads allowed them by law.

Such acts were, of course, improper and bad business management. The expenditures should have been recorded and fully accounted for. On the other hand, these drawings were fully disclosed, and apparently there was no attempt to conceal them. I do not think that this fact alone, with the explanations that appear in the record, in the absence of any other evidence adduced by objecting creditors, is sufficient to show such willful fraud as to take away their homestead rights.

Another ground with reference to Jack Aranoff is based on the allegation that the withdrawals of approximately $36 a month during the period, for payment of building and loan installments on property in his wife's name, constituted fraud and concealment of assets. These transactions were not concealed, but were recorded on the books of the partnership and charged against Jack Aranoff, and included within the $1,677.48 withdrawn by him as compensation for services rendered in the business. If this was not a legal transaction, the partnership still has a claim to the fund, and the trustee can pursue it into the property in question, but this would not be sufficient to show willful fraud or concealment on the part of Jack Aranoff.

The foregoing give the material facts in this case. The referee found that "there is no evidence of fraud on the part of the bankrupts, unless the fact that they sold at and below cost goods which had not been paid for in order to stay in business should be construed evidence of fraud sufficient to defeat a homestead," and that "the Referee cannot see that any of the money received during the course of business between the statement made in January, 1930, and November, 1930, was wrongfully diverted. The bankrupts claim that it was used for expenses and paying creditors what they could. It was a period of great depression in business, and many merchants in this section were not making any money."

In order to take away a bankrupt's right to homestead exemption, there must be a failure to make a full and fair disclosure of all the personal property of which he may be possessed at the time and he must be guilty of willful fraud in the concealment of same. "It is in the making of a full and fair disclosure of the property that good faith is required."

Fraud must be proved, not presumed. I do not think the foregoing facts show a failure on the part of bankrupts to make a full and fair disclosure of their property, nor that they have been guilty of willful fraud in the concealment of same.

The finding of the referee, therefore, allowing homestead exemptions, is approved, but not the amounts so allowed, inasmuch as they must be reduced in the manner set out below.

In this case each bankrupt claimed as exemption $50 covering clothing and personal effects, which are assumed to have been received, and $1,550 in money.

This is properly interpreted to mean a request for and consent to a sale of the assets out of which the cash for the homestead exemptions was to be realized. But, since specific property and not cash can be demanded, such a consent sale implies that the bankrupt, as the seller of his interest in the property, will stand his part of any loss resulting from the sale. In re Rollins Boot Shop (D. C.) 24 F.(2d) 422, 423.

Each bankrupt is entitled to claim property of the fair value of $1,550 at the time the property is set apart. This value may be different from its cost or appraisal value,

and is not usually established by a trustee's sale, for such sales, being forced, are often at a sacrifice. Fair value is the value which a willing purchaser and seller would likely agree upon in an unforced sale of the identical property.

When the whole property is sold, "the ratio of the value to be exempted to the fair value of the whole item of property sold is the bankrupt's interest in the sale, and measures his proportion of the loss, if the property sells for less than its fair value." In re Rollins Boot Shop, supra.

The record in this case is not sufficient for this court to compute the pro rata part of the loss or depreciated value which is chargeable to the homesteads, so that it is necessary to refer the case back to the referee to hear evidence and to find the fair value of the property sold in order to ascertain the proportion of loss, if any has been sustained by the sale, that should be borne by the exemptions.

The judgment of the referee with respect to the amount of the homesteads is therefore reversed, with direction that he find the true amounts which should be set aside to the bankrupts respectively, under the rules above laid down.